# Supreme Court of the Navajo Nation

**Kay C. Bennett, Appellant,**

v.

**Navajo Board of Election Supervisors, Appellee.**
**Decided December 12, 1990**

## OPINION

Before TSO, Chief Justice, AUSTIN and CADMAN (sitting by designation), Associate Justices.

Casey Watchman, Esq., Crownpoint, Navajo Nation (New Mexico), for the Appellant; and Lorene Ferguson, Esq., Navajo Nation Department of Justice, Window Rock, Navajo Nation (Arizona), for the Appellee.

Opinion delivered by CADMAN, Associate Justice.

Kay C. Bennett ("Bennett"), the appellant, appeals from a decision of the Navajo Board of Election Supervisors ("Board"), the appellee, disqualifying her as a candidate for the office of president in the 1990 Navajo Nation primary election. She appeals pursuant to 7 N.T.C. § 302 and 11 N.T.C. § 321.B.4. The appeal is timely.

On August 6, 1990, the Supreme Court issued its order granting the appeal and holding 11 N.T.C. § 8.A.5 — a statute limiting elective public office for president and vice president to previously elected officials and employees of the "Navajo tribal organization," — invalid because it denies due process and equal protection of the law. This opinion explains the reasons for that decision.

## I. FACTS

On May 25, 1990, Kay C. Bennett filed her declaration of candidacy for the office of president of the Navajo Nation. On June 18, 1990, the administrative office of the Navajo Board of Election Supervisors (called the Election Administration) wrote to Bennett to ask for additional information regarding her qualifications as a candidate. She provided that information, and on June 19, 1990, the chairman of the Board issued a determination letter disqualifying Bennett as a candidate pursuant to 11 N.T.C. § 8.A.5. (1990).

That statute provides as follows:

Qualifications for President and Vice President are:

Must have served in an elected Navajo tribal office, other than the office of school board member, or must have been employed within the Navajo tribal organization.

The basis for the determination was that Bennett had answered "no" to questions about whether she had previously held an elective office or had been employed within the Navajo tribal organization.

On June 27, 1990, Bennett asked the Board to reconsider that decision, and when it refused to grant her a hearing, she brought an unsuccessful action for an injunction in this Court, then another in the Window Rock District Court. That court found a violation of Bennett's due process right to be heard and directed the Board to hold a hearing to decide whether Bennett met the qualifications for president. *Bennett v. Redhouse*, No. WR-CR-122-90 (Window Rock Dist. Ct., July 23, 1990).

The Board conducted that hearing on July 26, 1990. The transcript of proceedings shows that the Board took great care to follow its own rules for election candidacy hearings and that Bennett received a full and fair hearing.

The hearing transcript and subsequent Board decision shows that the primary issue decided was whether, under the statute, Bennett had in fact "been employed within the Navajo tribal organization." While she also raised issues regarding nonenforcement and nonuse of the tribal employment limitation during the 1986 election, and sex discrimination, those issues are not relevant to the key questions of law and we do not decide them. On appeal, Bennett also raises issues regarding Board composition and voting, and we do not deal with them because they too are not relevant to what must be decided.

When the July 26, 1990 hearing opened, Gloria Dennision, the acting assistant director of the Election Administration, presented the staff position on the central issue and its proper resolution. She explained that the Election Administration screens election candidate applications using a form with questions regarding eligibility, and that Bennett's declaration was rejected because she answered "no" to the questions on Tribal Council membership, serving as a chapter officer, being a grazing committee or land board member, and having been a Navajo tribal organization employee.

Bennett's testimony before the Board was that she had previously been on the ballot for tribal chairman (in 1986), and while she had never been a tribal employee, she did a great deal to serve the Navajo People. She recited her work as a chaperone for Miss Navajo at functions around the United States, her membership on the New Mexico Human Rights Commission as a "Navajo Nation representative," her work with the Gallup Intertribal Ceremonial, her writings on Navajo values, and her work with school children. There was a great deal of discussion about whether checks given to her by the Navajo Nation and some of its entities were reimbursement or some form of compensation such as to qualify

her as a tribal "employee." Her fundamental position was that because she had served the Navajo Nation in various ways, she should be found to fall within the restriction. She excused her lack of actual employment with the Navajo Nation on the grounds of a lack of available jobs and discrimination against women.

The Election Administration called Gloria Bennett, the acting Navajo Nation personnel director, to present evidence on employment records and the definition of "employment." She was of the opinion that one could be a tribal employee through full-time, part-time or temporary employment with any tribally funded program, including the entities of the Navajo Nation such as NAPI (Navajo Agricultural Products Industry) or NECA (Navajo Engineering and Construction Authority). While Gloria Bennett testified that she could find no record showing Kay C. Bennett had been employed by "the Tribe," she admitted that the tribal personnel department did not keep records on employment by tribal programs such as Navajo Arts and Crafts, and there was no jurisdiction over NAPI or NECA employment. When asked about her definition of the term "Navajo organization," Gloria Bennett said that would be a program funded by the Navajo Nation Government or funded through federal government matching funds.

The members of the Board were split in their decisions, as may be seen from the debate recorded in the hearing transcript. At least three members were of the opinion that Bennett fell within the standard "Navajo tribal organization employee" because of her volunteer service and membership on the New Mexico Human Rights Commission, and three other members accepted the Election Administration position that one had to be on the payroll of some tribal government or entity program. The chairman cast the deciding vote, also accepting the staff position.

The undated written decision of the Board stated a mixed conclusion of fact and law:

> The Board is satisfied with the requirement that in order to be eligible, a candidate must have been an elected official or must have been employed with a Tribal organization meaning that one must have been on payroll, on a salary with the Tribe or its entities having been hired by the hiring process through an official personnel office of [sic] department.

There are two essential issues of law which arise from this record: First, did the provisions of 11 N.T.C. § 8.A.5 deny Bennett due process of law? Second, did the statute deny Bennett and her class equal protection of the law?

## II. SCOPE OF JUDICIAL REVIEW

The Court previously answered these issues affirmatively, finding that 11 N.T.C. § 8.A.5 was void for vagueness and that it denied equal protection of the law. In applying those principles of the Navajo Nation Bill of Rights, the Court invalidated an enactment of the Navajo Nation Council.

The doctrine of judicial review in Navajo law has been developing since at least 1958, when the Navajo Tribal Council established the judicial branch of the Navajo Tribal Government. Section 1, Resolution No. CO-69-58 (October 16, 1958) (previously codified at 7 N.T.C. § 201 (1978)). The preamble to that resolution shows that the Council intended to create courts of the Navajo Tribe in place of the existing courts of the Department of the Interior, and that "these courts be made effective and respected instruments of justice." This was the first step for the creation of a system of checks and balances in the Navajo Nation Government.

In 1978, this Court directly held that the Navajo courts have authority to review legislative actions by the Navajo Tribal Council. *Halona v. MacDonald*, 1 Nav. R. 189, 204-206 (1978). The Court in *Halona* reasoned that the Council in creating the judicial branch "did not exclude review of Council actions from its broad grant of power to the Courts." *Id.* at 204. The Court further held that "judicial review by tribal courts of Council resolutions is mandated by the Indian Civil Rights Act ...." *Id.* at 206. *Halona* is the law today and it has guided many decisions of our courts in the area of judicial review. See *Yazzie v. Navajo Tribal Board of Election Supervisors*, 1 Nav. R. 213, 215 (1978).

The Council adopted the Navajo Bill of Rights by Resolution No. CO-63-67 (October 9, 1967). At the time, the federal law which we know as the Indian Civil Rights Act, 25 U.S.C. § 1301 (1968), was pending in Congress, and the Navajo Nation joined national Indian opposition to that intrusion upon tribal sovereignty by "[a] declaration of the basic Navajo human rights ... necessary to the presentation of, and in keeping with, the dignity of the Navajo people." In 1986, the Council amended and expanded the Bill of Rights by Resolution No. CD-59-86 (December 11, 1986). The Declaration of basic Navajo human rights was enlarged because "other rights of the people have been recognized in various provisions of the Tribal Code, rules of court procedure, administrative procedures and Navajo case law."

Following the enactment of the 1968 Indian Civil Rights Act by Congress, the courts of the Navajo Nation used the theory of federal preemption of tribal law and enforced individual rights through application of the Act. See *Navajo Nation v. Browneyes*, 1 Nav. R. 300 (1978); *George v. Navajo Tribe*, 2 Nav. R. 1 (1979). The quoted portion of the preamble to Resolution No. CD-59-86 shows that the Navajo Tribal Council recognized and approved the ways in which the courts upheld the basic Navajo human rights set forth in the Navajo Nation Bill of Rights. The preamble to the 1986 law also shows that the Council recognized that rights declared in the amended Navajo Nation Bill of Rights could be freely exercised in court because the amended law constituted a "limited exception to the Sovereign Immunity Act." The Navajo Nation Bill of Rights has greater dignity and force as an organic law because of the amendment of 1 N.T.C. § 1, which now provides (in pertinent part):

No provision of this Chapter, the Navajo Nation Bill of Rights, shall be abridged or deleted by amendment or otherwise, except by referendum vote of the Navajo electorate, in accordance with applicable provisions of the laws of the Navajo Nation.

The Judicial Reform Act of 1985, Resolution No. CD-94-85 (December 4, 1985), amended 7 N.T.C. § 201 to provide as follows: "There is hereby established the Judicial Branch within the Navajo Tribal Government." That Act also created the Navajo Nation Supreme Court, "[i]n furtherance of the goal of strengthening the Courts of the Navajo Nation." The Supreme Court was empowered to "hear cases on appeal and render a final judgment based on law, equity, and tradition."

Navajo Tribal Council Resolution No. CD-68-89 (December 15, 1990) was an Act "Amending Title Two of the Navajo Tribal Code." Its preamble declared that "treating the Judicial Branch as a separate branch of government has proven to be beneficial to the Navajo Nation and has provided stability in the government." The preamble also declared the "immediate need to reorganize the Navajo Nation government by defining the powers of the legislative and executive branches and impose limitations on exercise of such powers." Section 6 of the resolution provides that neither the Title Two Amendments nor the 1985 Judicial Reform Act can be amended without a two-thirds vote of the full membership of the Navajo Nation Council.

In sum, the law of the Navajo Nation has evolved to recognize the full independence of the courts of the Navajo Nation as a separate branch of the Navajo Nation Government. Navajo law has self-imposed limitations upon the legislative and executive branches, and it recognizes basic and enforceable Navajo human rights. This Court, the Navajo Nation Supreme Court, has been empowered to enforce all these organic laws through the application of the rules of law, equity, and tradition. Following over thirty years of legal evolution, there is now a fully-developed principle of judicial review of Council actions.

The question of judicial review power here is whether the Navajo Nation Supreme Court may apply the Navajo Nation Bill of Rights to nullify an enactment of the Navajo Nation Council. The Navajo Nation Bill of Rights, the Judicial Reform Act of 1985, and the Title Two Amendments were intended to be fundamental, organic laws, as is obvious from the preambles and substantive provisions of those statutes. The question of conflicting enactments of a legislature is one of statutory construction, and the actual question posed is whether the Navajo Nation Council intended one law to prevail over another. That was clearly the intent of the Council. In enacting an entrenched declaration of basic Navajo human rights, creating a Supreme Court to ultimately enforce them, and in placing self-imposed limitations upon the legislative and executive branches of government, the Navajo Nation Council provided both the jurisdiction and the foundation for judicial review by the Navajo Nation Supreme Court.

The Navajo Nation Bill of Rights (1986) is a fundamental, overriding statute

which, by its own terms and necessary implication, allows judicial review to decide whether another law or an act of the Navajo Nation Government is void because of a violation of fundamental rights. We have judicial review authority because the Navajo Nation Council made the policy decision that there would be a fundamental law which is superior to other laws, and which cannot be changed without a vote of the Navajo People. Therefore, we have the power of judicial review because of an Act of the Navajo Nation Council.

The Navajo word for "law" is *beehaz'aanii*. While we hear that word popularly used in the sense of laws enacted by the Navajo Nation Council or the United States (including federal regulations), it actually refers to a higher law. It means something which is "way at the top"; something written in stone so to speak; something which is absolutely there; and, something like the Anglo concept of natural law. In other words, Navajos believe in a higher law, and as it is expressed in Navajo, there is a concept similar to the idea of unwritten constitutional law.

When the Navajo Nation and the United States concluded a treaty in 1868 to establish government-to-government relations, the Navajo People reserved their rights to self-government and to use their customs and traditions as law. *Arizona Public Service Co. v. Office of Navajo Labor Relations*, 6 Nav. R. 246, 254 (1990). To the extent that those customs and traditions are fundamental and basic to Navajo life and society, they are higher law.

The American constitutional doctrine of judicial review is based upon the idea of a "higher law" which overrides the government. In *Marbury v. Madison*, the United States Supreme Court said:

> That the people have an original right to establish, for their future government, such principles as, in their opinion, shall most conduce to their own happiness, is the basis, on which the whole American fabric has been erected. The exercise of this original right is a very great exertion; nor can it, nor ought it to be frequently repeated. The principles, therefore, so established, are deemed fundamental. And as the authority, from which they proceed, is supreme, and can seldom act, they are designed to be permanent.

1 Cranch 137, 176 (1801). The Court then explained that those fundamental principles were fixed in a written constitution "forming the fundamental law of the nation, and consequently the theory of every such government must be, that an act of the legislature, repugnant to the constitution, is void." *Id.* at 177.

Therefore, there is a Navajo higher law in fundamental customs and traditions, as well as substantive rights found in the Treaty of 1868, the Navajo Nation Bill of Rights, the Judicial Reform Act of 1985, and the Title Two Amendments of 1989. The power of judicial review flows from these principles and documents, and they set the boundaries for permissible governmental action by the legislative, executive, and judicial branches of the Navajo Nation.

## III. DUE PROCESS AND STATUTORY VAGUENESS

"Life, liberty and the pursuit of happiness are recognized as fundamental rights of all human beings" in the Navajo Nation Bill of Rights. 1 N.T.C. § 3 (1986). Based upon that recognition, the third section of the Bill of Rights provides that no person shall "be deprived of life, liberty or property, without due process of law." *Id.* Therefore, before deciding whether the candidacy statute is contrary to due process because it is vague, we must first establish whether Kay C. Bennett had any liberty or property right to offer herself as a candidate for the presidency of the Navajo Nation.

She did not have a property right. There is no property right to hold public office, although a candidate may have a due process right which arises out of Navajo Nation election law. There is no such right here, and instead we deal with a statute which restricts the right. *In the Matter of Katenay*, 6 Nav. R. 81, 84-85 (1989); *In re Certified Questions II*, 6 Nav. R. 105, 119 (1989).

We have previously established the principle that this Court will interpret the Navajo Nation Bill of Rights "in a way that will enhance Navajo culture and tradition." *Billie v. Abbott*, 6 Nav. R. 66, 74 (1988). The Navajo Nation Bill of Rights also directly recognizes Navajo custom and tradition by providing as follows: "The enumeration herein of certain rights, shall not be construed to deny or disparage others retained by the people." 1 N.T.C. § 1 (1986). The rights retained by the people are the *beehaz'aanii* we described above.

Anglo law has the concept of "political liberty," which is the "[l]iberty of the citizen to participate in the operations of government, and particularly in the making and administration of the law." Black's Law Dictionary 828 (5th ed. 1989). While the right or privilege of placing one's name in nomination for public elective office is a part of political liberty, thus making it a due process right, that liberty may be restricted by statute. Any such restriction must be reasonable and forward some important governmental interest.

Navajo *beehaz'aanii* speaks to political liberty, and we apply Navajo common law rather than the Anglo concept of political liberty. In Navajo tradition, government and governing was a matter of the consensus of the people, and Navajos had a participatory democracy. It was, in fact, one of the purest democracies in human history. Long before the United States of America extended the privilege and right to vote to those who did not own property and to women, all Navajos participated in public decisions. Therefore, there is a strong and fundamental tradition that any Navajo can participate in the processes of government, and no person who is not otherwise disqualified by a reasonable law can be prohibited from holding public office. Therefore, there is a sufficient liberty interest for the application of the due process rule regarding the invalidity of vague statutes.

That rule is as follows:

> Statutes affecting personal and property rights will be deemed invalid under due process of law when they are so vague and uncertain that men [sic] of common intelligence must necessarily guess at their meaning. 'A statute,' says the United States Supreme Court, 'which either forbids or requires the doing of an act in terms so vague that men [sic] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'

1 Antieau, *Modern Constitutional Law* § 7:20 (1969) (quoting *Connally General Constr. Co.*, 269 U.S. 385, 391 (1962).

The 1920 case, *United States v. L. Cohen Grocery Co.*, involved the Lever Act, a statute which made it unlawful to "exact excessive prices for any necessaries." 255 U.S. 81, 86 (1920). The United States Supreme Court voided the statute for vagueness, and in doing so stated some of the reasons for the rule. While Congress has the power to define crimes, it cannot delegate that power and thus leave the definition or standard of a crime to "the variant views of the different courts and juries which may be called on to enforce it." *Id.* at 87. The term "excessive prices" created confusion in the courts and caused many different and conflicting approaches, as the Court illustrated in a footnote showing the approaches taken by various courts. *Id.* at 90 n.1. Therefore, given the fact that a defendant could not know the nature and cause of the accusation against him, and Congress improperly delegated the power to define the crime, the statute was unconstitutional.

In 1973, the United States Supreme Court dealt with prohibitions against political activity by both federal and state employees, including the question of whether those prohibitions were void for vagueness. The test was this:

> [T]here are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest.

*CSC v. Letter Carriers*, 413 U.S. 548, 578-579 (1973); *Broadrick v. Oklahoma*, 413 U.S. 601, 608 (1973).

These authorities lead us to ask (1) Whether the election statute was one which the ordinary person, exercising ordinary common sense, could understand; (2) Whether candidates and election officials had to guess at its meaning; and, (3) Whether the statute caused those people to differ as to its application.

When we discuss "the ordinary person" we refer to the ordinary Navajo person, who very often will be bilingual, with English as a second language. This creates severe problems for statutory drafting because many Navajos would have a difficult time easily comprehending the terms and usages found in many Navajo statutes. Obviously, no one would expect that the Navajo Nation Uniform Commercial Code, or other technical statutes adopted for special purposes, will

be void because the ordinary person does not understand them. However, where an individual claims rights or privileges which are fundamental, and where even officials administering the law cannot understand the statute, there is a vagueness problem.

In this case, the Election Administration took its own view of the "employed within the Navajo tribal organization" requirement, and even it had to call upon the Navajo Nation personnel office for its opinion of what the quoted language meant. The question was not the meaning of "employed" or "employment," which are well-established by many legal definitions, but what a "Navajo tribal organization" happened to be. While the Election Administration and the Board adopted the test of actually being on the payroll of a Navajo Nation agency or entity, they did not address employment with the chapters, which are also organs of the Navajo Nation Government. Kay C. Bennett pointed to her volunteer service to Navajo programs, and the Board split, four to three, over the meaning of the statute.

Therefore, because the election officials could not decide the meaning of the statute, no person of ordinary intelligence could be expected to understand it. Obviously, Bennett, the Election Administration, and the Board of Election Supervisors were all guessing at the meaning of "Navajo tribal organization," each with a justifiable argument as to what it should mean. Finally, the statute did cause people to differ as to its application. While Bennett's nonuser and nonapplication argument that the requirement should be waived since it was not used in 1986 is invalid, she can point to uneven and different applications to different candidates, including herself, in the future.

Statutes which confer rights grounded upon Navajo liberties must contain ascertainable standards. That is, they must sufficiently describe standards and requirements for the exercise of the right so that the ordinary person will know what they are and be able to satisfy them. Election campaigns are expensive, and even at the early stages of the election process, candidates must pay filing fees and expend monies and energy to get their campaigns off the ground. It is unfair to cause a candidate to expend money on a chance he or she may be able to persuade the Board that he or she fits the standard "employed within the Navajo tribal organization," and it is unfair to deter people from exercising the liberty right to run for public office because they think they may not fall within the vague standards of the statute.

## IV. EQUAL PROTECTION

Bennett asserts that the qualifications required to run for president discriminate against women. The basis for her claim is 1 N.T.C. § 3, which provides that "[e]quality of rights under the law shall not be denied or abridged by the Navajo Nation on account of sex." This provision of the Navajo Nation Bill of Rights was added by Resolution No. CF-9-80 (February 7, 1980) in order to recognize

"the importance of the women in Navajo society ... in keeping with the tradition of the Navajo people." *Id.*, Preamble §§ 1, 5. The amendment uses the language of the proposed Equal Rights Amendment to the United States Constitution.

Bennett has not shown how the candidacy requirement denies women equality of rights under the law. The candidacy statute does not specifically exclude women from office because of their gender, and Bennett did not show how or why it caused a discriminatory or disparate impact on those of her gender, excluding or inhibiting them from public elective office.

While it may be true that in the past women have been excluded or discouraged from the ranks of the Navajo Nation Council and the more important boards and committees of the Navajo Nation Government, Bennett was denied a place on the ballot because she had not been employed by the Navajo tribal organization. The Court is sensitive to the possibility of a past pattern and practice of excluding women from public office, but there are sufficient numbers of women employed by the Navajo Nation to make it possible for many to run for public office under the statute.

In addition, Bennett asserts that the statute denies equal protection of the law, and that claim has merit. 1 N.T.C. § 3.

We have already discussed the right to political liberty, including the right to participate in the governmental process in office. This right is a part of the concept of republican participatory democracy and it is grounded in Navajo tradition. Therefore, we are dealing with a fundamental right which the Navajo Nation Council can limit only for good and weighty reasons for the protection of the public interest.

Eleven, N.T.C § 8.A.5. makes legislative classifications of who may run for the office of president. Those who have previously served in elective office of the Navajo Nation (other than school boards) and those who "have been employed within the Navajo tribal organization" are entitled to offer themselves as presidential or vice presidential candidates, while Navajos who have not been tribal officials or employees cannot. The question is whether this classification is arbitrary or whether it serves some important governmental interest.

Neither party has offered the Court an explanation of the motives of the Navajo Nation Council in enacting this statute, so we are left to interpret it on its face in light of the overall thrust of the Navajo Nation Election Code. It appears that the intent of the statute was to provide Navajo voters assurances that candidates for the office of president understand how the Navajo Nation Government operates. If that is the purpose of the provision, it is overbroad. It is entirely possible that an individual may have a great deal of knowledge of the workings of government without ever having been a tribal official or employee. One can learn about government through state or federal employment, through academic studies, or in many other ways. While the Navajo Nation Council has an interest in desiring that presidential candidates have experience with government, the restrictions exclude far too many Navajos who may have as much or more expe-

rience and knowledge of the processes of government than elected officials or government employees.

A more severe defect in the statute is it delegates arbitrary authority to the Board of Election Supervisors to exclude candidates and to take the right of judging their qualifications away from Navajo voters. A legislature can set minimum qualifications for public office, particularly those having to do with integrity and honesty, but without a showing of a valid and substantial public interest, arbitrary qualifications are invalid.

We hold that there was no rational basis for the classifications established by the statute, and there is no valid and substantial governmental interest to support the requirements of 11 N.T.C. § 8.A.5. It therefore denies Bennett and her class equal protection of the law.

The decision of the Navajo Board of Election Supervisors is reversed.